UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIFFORD C. WHITENER,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Civil Action No. 04-0273 |
| ) | |
| GORDON R. ENGLAND,    ) | |
| Secretary of the Navy,    ) | |
| ) | |
| Defendant.    ) | |
| _____) | |

**MEMORANDUM OPINION**

Plaintiff Clifford C. Whitener is a 56 year-old African American male who in 2002 was employed by the Department of the Navy as a GS-14 General Engineer. He brought this suit against the Secretary of Navy, Gordon R. England. Plaintiff alleges that the Navy discriminated against him because of his age and race in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, 29 U.S.C. § 621 *et seq.*, when it selected a younger white applicant for the position of GS-15 Supervisory General Engineer. Defendant moves for summary judgment arguing that the applicant whom it selected for the position was in its judgment better qualified than plaintiff. An accompanying order grants defendant's motion and dismisses the complaint for the reasons that follow.

BACKGROUND

I.   **The Supervisory Engineer Vacancy**

Strategic Systems Programs ("SSP"), an agency within the Department of Navy, is

responsible for the weapons system that deploys most of the United States' submarine-based nuclear arsenal. *See* Defendant's Memorandum in Support of Motion for Summary Judgment [Def. Mem.], at 1. SSP employs approximately 112 engineers at its headquarters, 30 of whom belong to the Technical Division of SSP. *See id*.

Whitener joined SSP's Technical Division in 1988 as a GS-13 Mechanical Engineer and rose to the position of GS-14 General Engineer. Defendant's Local Civil Rule 7(h) Statement Of Material Facts Not In Dispute [Def. R. 7(h) Stmt] ¶ 10. In 2001, Whitener's immediate supervisor left the Technical Division, and soon thereafter SSP announced a vacancy for his position, a GS-15 Supervisory Engineer. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [Pl. Mem.], at 4; Def. R. 7(h) Stmt ¶ 3. The vacancy announcement detailed several responsibilities, including: "assuring the physical/mechanical integration and compatibility of the entire weapon system"; "assuring system safety"; "weapon system accuracy"; "directly supervis[ing] four [SSP employees]"; and "devlop[ing] and direct[ing] necessary changes in SSP policy and procedures to comply with" changing federal regulations. *See* Def. Ex. 3, Vacancy Announcement (Aug. 20, 2001).

Whitener responded to the vacancy announcement on March 24, 2002 and submitted an online resume. Compl. ¶ 14. In April 2002, the Navy included Whitener on a list of ten SSP employees certified as "best qualified." Def. R. 7(h) Stmt ¶ 6. Whitener was the only African American; one was Asian American; the other eight were Caucasian. *See* Def. Ex. 1, Meserole Decl. ¶ 5.

The Technical Division's Chief Engineer, Marcus Meserole (who is now deceased), and its Deputy Chief Engineer, Charles LaSota, reviewed the ten applications and jointly interviewed

the certified candidates. Def. R. 7(h) Stmt ¶ 9. At the interview and prior to the questioning, they provided each applicant with a written copy of four questions that would be asked during each interview. *Id.*; Def. Ex. 11., Whitener Dep., at 44 (Nov. 1, 2004). The four questions concerned nuclear safety, system accuracy, staff integration, and leadership. *Id.* at 45; *see* Def. Ex. 8, Whitener Interview Notes. The question on leadership stated: "This is a leadership position. What two things in your experience most qualify you for a leadership position?" *Id*.

After the interviews, Meserole and LaSota independently concluded that Steven Landau, an SSP Electronics Engineer, was the best qualified and offered him the position. Def. Ex. 5, LaSota Dep., at 47 (July 9, 2004).

## II.    Whitener's and the Selectee's Qualifications

### A.    Past Experience

Landau's resume showed that he had been a GS-14 Electronics Engineer since 1998, a GS-14 General Engineer from 1993 to 1998, and a GS-13 General Engineer from 1988 to 1993. Def. Ex. 7, Landau Resume. At the time of his selection, Landau's total SSP experience at the GS-14 level was thus 9 years, at the GS-13 level 5 years, for a total of 14 years experience as a federal employee at SSP. *Id.* Whitener's resume showed that he had been a GS-14 General Engineer since 1990, and a GS-13 Mechanical Engineer from 1988 to 1990. Def. Ex. 6, Whitener Resume. At the time of Whitener's non-selection, his total SSP experience at the GS-14 level was thus 12 years, at the GS-13 level 2 years, for a total of 14 years as a federal employee at SSP. *Id*. On the basis of years of experience alone, it appears that Whitener had approximately 3 more years of experience at the GS-14 level than Landau, but both had 14 years of total experience at SSP.

Both candidates graduated from college with similar grade point averages in relevant majors, Whitener with a 3.0 GPA in Chemistry and Landau with a 2.9 GPA in Mechanical Engineering.  Def. Exs. 6 & 7, Whitener and Landau Resumes.  However, Landau, at the time of the selection, was expecting to graduate with a degree in Project Management in 2003 from George Washington University with a GPA of 3.9.  Def. Ex. 7, Landau Resume.  Whitener, though he had completed two courses in government management and submarine design, had no expectation of obtaining a graduate degree.  Def. Ex. 6, Whitener Resume.  Meserole specifically testified at the administrative level that he preferred SSP employees who obtained advanced degrees and that this was a factor in choosing Landau over Whitener.  Def. Ex. 10, Investigative Transcript, at 157-58 (Jan. 16-17, 2003).

B.   **Interview Performance**

Defendant states that Landau overall performed better than Whitener at the interview, particularly in his response to a request for examples of leadership ability.  Landau provided two explicit examples, discussing "his work as SSP's representative to the United Kingdom (UK), and his work as a team leader in SP-27, the Missile Branch.  He was able to explain how his leadership skills had been utilized on those projects, bringing together the diverse opinions of various players to achieve consensus and to see and realize ambitious goals."  Def. Ex. 15, LaSota Decl. ¶ 2.  Both Meserole and LaSota were impressed by Landau's answers.  Def. Ex. 1, Meserole Decl. ¶ 6; Def. Ex. 15, LaSota Decl. ¶ 2.

On the other hand, Whitener did not answer the question well.  *See id*; Def. Ex. 1, Meserole Decl. ¶ 6; Def. Exs. 8 & 9, Whitener and Landau Interview Notes.  Whitener gave two examples of his previous work, but failed to articulate how that work related to or demonstrated

his leadership abilities. *See id.*; Def. Ex. 1, Meserole Decl. ¶ 6; Def. Ex. 15, LaSota Decl. ¶ 2. As both LaSota and Meserole independently recorded during Whitener's interview, Whitener provided "[n]o specifics" and "[d]id not answer directly" the request for examples of his leadership ability. Def. Exs. 8 & 9, *supra*. Instead, "[h]e talked about working on the technical aspects of a welding instruction (SPINST) and how that complied with Technical Overarching Guidance (TOG), but he failed to articulate how that related to qualities of leadership." Def. Ex. 15, LaSota Decl. ¶ 2. Whitener himself admitted: "In response, I *described the attributes* of a good leader and explained how I would act in the Supervisory Engineer position. . . . Since Mr. Meserole did not ask me for specific examples of my leadership abilities, I did not feel it was necessary for me to provide this information. " Def. Ex. 12, Whitener Aff. ¶¶ 2-3 (emphasis added). Based largely on this (admitted) failure and Landau's superior interview performance, the interviewers ranked Landau ahead of Whitener. Def. Exs. 1 & 15, *supra*.

**III.   Procedural History**

Whitener disagreed with Meserole's and LaSota's determination that—based on Landau's graduate degree, superior interview performance, and overall qualifications—Landau was the best candidate for the position. He claimed his qualifications were superior to Landau's and that he was not selected because of his race and age. He attempted to resolve this claim administratively. *See* Pl. Ex. N, EEO Counselor's Report, at 6; *see also* Compl. ¶ 7 (alleging exhaustion of administrative remedies pursuant to 29 C.F.R. §1614.407(b)[1]). When that failed he

---

[1] The record does not indicate whether plaintiff has in fact exhausted his administrative remedies, but as defendant does not assert any exhaustion deficiencies, the court deems the affirmative defense waived as to both the Title VII and ADEA claims. *See Hartman v. Duffey*, 88 F.3d 1232, 1236 n.3 (D.C. Cir. 1996); *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Kennedy v. Whitehurst*, 690 F.2d 951, 961 (D.C. Cir. 1982); *cf. Rann v. Chao*, 346 F.3d

filed this suit. On March 11, 2005, defendant filed this motion for summary judgment, which Whitener opposed, and shortly thereafter Judge Roberts referred the motion to me. *See* Dkt Nos. 21, 24, & Order Referring Motion (May 18, 2006).

## DISCUSSION

**I.     Standard**

A court must grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A disputed issue of fact is genuine and material, precluding summary judgment, if a reasonable jury could find in favor of the non-moving party on that issue from the record evidence, and that finding could determine the outcome of the trial. *Anderson*, 477 U.S. at 248.

As a general rule, a court must assume the truth of all statements proffered by the party opposing summary judgment and construe all evidence in the light most favorable to the non-moving party. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Indeed, it must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

There is an exception to this rule, however. *Greene*, 164 F.3d at 675. A plaintiff may not

---

192, 195-96 (D.C. Cir. 2003) (declining to address whether a plaintiff who has started the administrative process under ADEA is required to exhaust that process).

rely on unsubstantiated, conclusory allegations to generate "specific facts showing there is a genuine issue for trial," Fed. R. Civ. P. 56(e).  In the employment discrimination context, this means that a plaintiff "must support his allegations of superior qualifications with facts in the record; a mere unsubstantiated allegation of superior qualifications creates no genuine issue of fact and will not withstand summary judgment." *See Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  "Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.  In short, a plaintiff must establish more than a "mere existence of a scintilla of evidence" in support of his claims.  *Anderson*, 477 U.S. at 252.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

**II.    Applicable Law**

This Circuit applies the *McDonnell Douglas* burden-shifting framework to employment discrimination claims brought under both Title VII (race discrimination) and ADEA (age discrimination).  *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999).  The framework requires plaintiff to establish a prima facie case of race and/or age discrimination by showing that he (1) belongs to a statutorily protected class, (2) applied and was qualified for the position, and (3) was rejected for the position under circumstances that give rise to an inference of discrimination.  *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004). Establishing a prima facie case is not difficult by any measure, and here defendant concedes Whitener has established one.  *See id*; Def. Mem., at 11-12.

A plaintiff's establishment of a prima facie case creates only a rebuttable presumption

that the employer unlawfully discriminated against him. *Teneyck*, 365 F.3d at 1151. The burden then shifts to the defendant to rebut the presumption by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The defendant need not persuade the court that it was actually motivated by the proffered reasons—*i.e.*, the court is precluded from assessing the defendant's credibility in this regard. It is sufficient that the defendant produce evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff. *Id*. A defendant who carries this burden of production thereby rebuts the presumption raised by the prima facie case. *Id*. Here, it is noteworthy that a poor performance at a job interview, by itself, is sufficient to rebut a prima facie case of discrimination. *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1182 (D.C. Cir. 1996).

Once a defendant rebuts a prima facie case of discrimination, the burden-shifting framework is no longer relevant; the plaintiff resumes the burden of production and persuasion that discrimination was the real reason for the employment decision, *i.e.*, that the defendant's proffered reason was pretextual. *Teneyck*, 365 F.3d at 1151. The burden to show pretext merges with plaintiff's burden of persuading the fact-finder that he has been the victim of intentional discrimination. *Burdine*, 450 U.S. at 254. Once the employer has met its evidentiary burden, the ultimate question at summary judgment becomes whether the trier of fact may infer intentional discrimination from all the evidence. This includes the plaintiff's prima facie case, any evidence the plaintiff presents to attack the employer's proffered explanations for its actions, and any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer). *Dunaway v. Int'l*

*Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C. Cir. 2002).

Importantly, "Title VII liability cannot rely upon [the trier of facts'] determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Fischbach*, 86 F.3d at 1183. To prevail against summary judgment, a plaintiff must prove that a "reasonable employer would have found the plaintiff to be *significantly better* qualified for the job." *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1294 (D.C. Cir.1998) (en banc) (emphasis added). Plaintiff must demonstrate a "wide and inexplicable gulf" between his and the selectee's qualifications, *Simpson v. Leavitt*, 437 F.Supp.2d 95, 101 (D.D.C. 2006) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003)). However, "[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call," rather than committed illegal discrimination. *Aka*, 156 F.3d at 1294. It is well-settled that "close calls" in non-selection cases cannot withstand summary judgment; courts do not act as "super-personnel" departments for second-guessing the government's employment decisions. *See id.*; *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003); *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999); *Fischbach*, 86 F.3d at 1183.

**III.    Analysis**

To rebut Whitener's prima facie case, the Navy must demonstrate a legitimate non-discriminatory reason for its selection of Landau. *Reeves*, 530 U.S. at 142. The Navy's proffered reason is that Landau, in its view, was better qualified for the position, and points to the resumes and interview performance of the two applicants. *See* Def. Mem., at 12.

While there is no unassailable ground for finding Landau a better candidate that Whitener, I conclude that defendant's stated reasons, without assessing their credibility, are neither unreasonable nor illegally discriminatory. *See Fischbach*, 86 F.3d at 1182. This finding rebuts plaintiff's prima facie case. *See Burdine*, 450 U.S. at 254.

Nor is there enough record evidence of employment discrimination for this action to go forward to a trial. *See Celotex*, 477 U.S. at 322-23; *see also Aka*, 156 F.3d at 1290 (a "court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination and [that] accordingly summary judgment is inappropriate"). I thus conclude that no reasonable juror could find that Whitener was a "significantly better" candidate than Landau for the Supervisory Engineer position. *Aka*, 156 F.3d at 1294. Both candidates had the same number of years of experience at SSP, at relatively similar levels of responsibility. They were both well-educated with substantial, relevant professional experience, although only Landau had a graduate degree, a fact significant to the interviewers. Moreover, there appears to be no genuine dispute that, as the interviewers determined and Whitener admitted, Whitener failed to answer the leadership question adequately. Drawing all reasonable inferences in favor of Whitener, I find no genuine issue of material fact, worthy of a jury trial.

Whitener attempts to create a cognizable dispute, but none of the "genuine issues in dispute" in plaintiff's statement carries the day. For instance, plaintiff avers "Whitener provided two examples of leadership" at the interview. Plaintiff's Statement of Genuine Issues in Dispute [Pl. Stmt] ¶ 1. However, the deficiency was not the lack of examples but the failure to link those examples to his leadership abilities. *See* Def. Ex. 1, Meserole Decl. ¶ 6 ("Whitener described

two projects he worked on without describing how he led them, or how his involvement demonstrated leadership ability."); Def. Ex. 15, LaSota Decl. ¶ 2 ("He talked about working on the technical aspects of a welding instruction (SPINST) and how that complied with Technical Overarching Guidance (TOG), but he failed to articulate how that related to qualities of leadership."); *see also* Def. R. 7(h) Stmt ¶ 19 (citing to LaSota Decl. ¶ 2).

Whitener argues that Meserole and LaSota, as his supervisors, were already familiar with (but chose to ignore) the projects he cited at the interview, so there was no need for him to link them to his leadership abilities. *See* Pl. Stmt ¶¶ 2-3; Pl. Mem., at 13. However, failing to answer a question, can by itself be a reason to reject a job applicant. *See Carter v. George Washington Univ.*, 387 F.3d 872, 880 (D.C. Cir. 2004). When an agency "says that it chose between [a selectee] and [a non-selectee] based solely upon their answers during the interview," such an assertion, "[b]eing both reasonable and non-discriminatory[,] . . . is enough" to counter an allegation of employment discrimination. *Fischbach*, 86 F.3d at 1182.

Whitener asserts there is a genuine issue of material fact as to defendant's proffered reasons for choosing Landau because defendant's selection was based in part on a project Landau oversaw and mishandled, the Low Cost Test Missile Kit (LCTMK). Pl. Stmt ¶ 7. However, plaintiff has put in the record zero evidence from which the court can infer that Landau actually mishandled that program. Plaintiff's evidence, filed under seal, does not concern Landau's handling of the project at all but rather certain delays and cost overruns noted by an independent government contractor; the documents make no mention of Landau. No reasonable jury could find based on these documents that the delays and cost overruns of the LCTMK were caused by Landau.

Finally, Whitener argues that the numbers of African Americans (or lack thereof) in the upper echelons of SSP demonstrate that he was racially discriminated against when he was denied the promotion. Pl. Stmt ¶ 5. In determining whether an employee has been the subject of discrimination, "the courts have consistently emphasized that the ultimate issue is the reasons for the *individual* plaintiff's treatment, not the relative treatment of different groups within the workplace." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (Calabresi, J.) (emphasis added); *see Krodel v. Young*, 748 F.2d 701, 709-10 (D.C. Cir. 1984) (statistical evidence in individual discrimination cases is "less relevant" because the ultimate question is whether the plaintiff himself was subjected to racial discrimination).

However, Whitener has presented no evidence as to the available pool of applicants to the SES or GS-15 levels—*e.g.*, whether sufficient numbers of African Americans apply for such positions that the statistics are significant. Indeed, Whitener has employed no statistical expert to explain to the court whether any of the disparities are significant. Statistics that "indicate nothing more than an under-representation [of a protected class]" cannot by itself create a triable issue of fact. *Horvath v. Thompson*, 329 F.Supp.2d 1, 10 (D.D.C. 2003) (Huvelle, J.). It is well-settled that merely noting the composition of a workforce, without more, cannot sustain a discrimination action. *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650 (1989); *Koger v. Reno*, 98 F.3d 631, 639 (D.C. Cir. 1996). Finally, the very document Whitener relies upon states that, of the 78 promotions in 2002 (of which the GS-15 Supervisory Engineer position was one), "[c]ommand-wide, most EEO groups [including African American males] received promotions at a *higher* rate than their respective representation in the workforce." Pl. Ex. P, AEP Report, at 130 (emphasis added). Construing the facts in a light favorable to Whitener, the court finds that

the statistics, by themselves, are not grounds on which a reasonable juror could infer race discrimination as to Whitener as an individual.

Most of the above discussion concerns race discrimination under Title VII. Whitener fails to flesh out any real argument or present any evidence concerning the age discrimination claim under ADEA. He conclusorily asserts, in two brief paragraphs, that "Mr. Whitener has already cited sufficient evidence to avoid dismissal of his age discrimination claim." Pl. Mem., at 16. Nothing in the present record indicates discrimination based upon age, and summary judgment is appropriate as to the ADEA claim as well.

## CONCLUSION

For the foregoing reasons, the court will grant defendant's motion for summary judgment and dismiss the case in an accompanying order.

/s/

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

DATED: December 19, 2006